UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

FRANK L. HOWARD,

    Plaintiff,

v.

                        Case Number 2:05-cv-81

                        Hon. Janet T. Neff

CORRECTIONAL MEDICAL SERVICES, INC.
AND BADAWI ABDELLATIF M.D.,

    Defendants,

_____/

| | |
|---|---|
| Edward P. Perdue (P55888) | Ronald W. Chapman (P37603) |
| Julie Westra (P71388) | Brian J. Richtarcik (P49390) |
| DICKINSON WRIGHT PLLC | Chapman and Associates, P.C. |
| Attorneys for Plaintiff | Attorneys for Defendants Dr. Abdellatif and |
| 200 Ottawa Ave., N.W., Suite 900 | Correctional Medical Services, Only |
| Grand Rapids, MI  49503 | 40950 North Woodward Ave., Suite 120 |
| (616) 458-1300 / (616) 458-6753 fax | Bloomfield Hills, MI 48304 |
| | (248) 644-6326 / (248) 644-6324 fax |

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF DRS. BARTH AND DROUILLARD**

### I.    INTRODUCTION

In the present motion *in limine*, Plaintiff seeks to exclude from trial the testimony of Defendants' Correctional Medical Services, Inc. ("CMS") and Dr. Badawi Abdellatif's retained experts: Dr. Timothy Barth and Dr. Paul Drouillard.

This issue was precipitated by the fact that Plaintiff, after noticing substantial similarities between the expert reports of Dr. Barth and Dr. Drouillard, filed a *Motion to Compel the Production of Engagement Letters and Other Materials Provided to Experts* ("Motion to Compel").  (Docket No. 176).  Defendants' counsel responded to this motion by offering to

1

comply with the requested relief and allow a review of all documents relied on by both proffered experts. (Docket No. 184). Upon investigating these materials, Plaintiff's counsel discovered that Defendants' counsel had actually drafted and forwarded a copy of what essentially became Dr. Drouillard's expert report. (See Richtarcik correspondence and Draft Report attached as **Exhibit A**). Dr. Drouillard had only made cosmetic changes and signed the report drafted by and forwarded to him by Defendants' counsel. *Id*.

That was not the only disturbing observation evident from an analysis of Defendants' expert reports. The two reports, from different experts, were substantially similar, using identical language in many instances. The following chart is taken from Plaintiff's *Motion to Compel* and highlights examples of the striking similarities between Drs. Barth and Drouillard's expert reports (attached as **Exhibits B** and **C** respectively):

| **Expert Report of Dr. Barth** | **Expert Report of Dr. Drouillard** |
|---|---|
| In my medical opinion and judgment, the examination, treatment, and care plan initiated by Dr. Abdellatif, as confirmed by the medical record and his Deposition testimony, is within the medical standard of care and training of a licensed physician practicing the medical specialty of internal medicine. (p. 9) | In my medical opinion and judgment, the medical examination, treatment, and care provided by Dr. Abdellatif, as observed in Plaintiff's medial chart and the Deposition testimony of Dr. Abdellatif, is within the medical standard of care and training of a licensed physician practicing the medical specialties of Internal Medicine and/or Rheumatology under the circumstances. (p. 3) |
| Dr. Abdellatif's examination was within the standard of care. His documented observations included the following: Plaintiff was able to walk with a slight limp but could flex and extend his left ankle without difficulty, Plaintiff did not complain of significant pain. (p. 9) | Dr. Abdellatif's examination was within the standard of care. His observations, included the following: Plaintiff was able to walk with a slight limp but could flex and extend his left ankle without difficulty, Plaintiff did not complain of significant pain. (p. 3) |
| … Dr. Abdellatif properly ordered Plaintiff to receive an Ace wrap and to continue Indocin medication for pain. (p. 9) | Dr. Abdellatif properly ordered Plaintiff to receive an Ace wrap and to continue Indocin medication. (p. 3) |

| | |
|---|---|
| Within a reasonable degree of medical certainty, based on Dr. Abdellatif's examination the Plaintiff did not have a ruptured Achilles tendon on September 20, 2002. (p. 10) | Given the nature of Dr. Abdellatif's observations, it is more probable than not, with a reasonable degree of medical certainty, that on September 20, 2002 Plaintiff did not have a ruptured Achilles tendon. (p. 3) |
| Subsequently, the record indicates that Plaintiff never complained again about his left Achilles tendon or ankle. Plaintiff remained under Dr. Abdellatif's medical care and treatment and on October 4, 2002 Dr. Abdellatif saw Plaintiff for the second and last time. (p. 10) | Subsequently, the record indicates that Plaintiff never complained again about his left Achilles tendon or ankle for as long as he was under Dr. Abdellatif's medical care and treatment at Alger's Correctional Facility. On October 4, 2002 Dr. Abdellatif saw Plaintiff for the second and last time. (p.4) |
| During the second visit, the record indicates that Plaintiff complained only of chronic lower back problems. Plaintiff offered no complaints about his left ankle or Achilles tendon and Dr. Abdellatif, who followed up on his previous examination did not observe any findings consistent with significant ankle injury. (p. 10) | During this second visit the record indicates that Plaintiff complained only of a chronic lower back problem, and Dr. Abdellatif did not observe any complaints about his left ankle or Achilles tendon. (p. 4) |
| Plaintiff's complaints and examination on October 4, 2002, were completely unrelated to the previous injury allegedly sustained to his Achilles tendon. Within a reasonable degree of medical certainty, Plaintiff did not have a ruptured Achilles tendon at the time of his doctor's appointment on October 4, 2002. (p. 10) | Within a reasonable degree of medical certainty, Plaintiff's complaint and examination on October 4, 2002 was completely unrelated to the injury he allegedly previously sustained to his Achilles tendon. As of October 4, 2002, it is more probable than not within a reasonable degree of medical certainty that Plaintiff did not have a ruptured Achilles tendon… (p. 4) |
| The medical record indicates that Plaintiff ambulated effortlessly on his own, and Dr. Abdellatif's examination of Plaintiff's left Achilles tendon area by palpation was normal and ruled out a rupture. (p. 10) | …given that the record indicates that Plaintiff was able to ambulate on his own, and Dr. Abdellatif's examination of Plaintiff's left Achilles tendon area by palpation was negative and ruled out a rupture. (p. 4) |
| Dr. Abdellatif's duty to further follow Plaintiff's medical care and treatment ended on October 18, 2002, when the Plaintiff was transferred from the Alger Correctional Facility to the Standish Correctional Facility. (p. 10) | Dr. Abdellatif's duty to further follow up concerning Plaintiff's medical care and/or treatment ceased on or about October 18, 2002 when Plaintiff was transferred to Standish Correctional Facility. (p. 4) |

3

| Given that Plaintiff claimed to both Drs. Urban and Divina that this rupture occurred on September 19, 2002, and not after October 4, 2002 as is more likely, they reasonable believed Plaintiff's alleged rupture was chronic in nature (rather than acute) and was present for almost seven weeks. Therefore, immediate surgical repair was not required and would not affect or change the outcome. (p. 11) | Because Plaintiff informed Dr. Urban on October 18, 2002 and Dr. Divina on November 6, 2002 that his injury occurred on September 19, 2002, by the date of Dr. Divina's diagnosis of the ruptured Achilles tendon Plaintiff's treating physicians were of the impression the injury was already seven (7) weeks old and therefore chronic in nature not requiring urgent surgical repair. (p. 5) |

This is only the tip of the iceberg. The Court should exclude all testimony from both of Defendants' proffered expert witnesses for a host of reasons.

First, Dr. Barth's proffered testimony is barred by Federal Rule of Evidence ("FRE") 702, because it is unreliable—his opinions are not based upon any methodology, but rather rely upon speculation and conjecture that further Defendants' legal theories of the case. Second, Dr. Barth's proffered testimony is not relevant and is inadmissible under FRE 702 and 704 because the express purpose of his opinion is to find whether CMS and Dr. Abdellatif's state of mind reaches the level of deliberate indifference; this invades the province of the jury and also usurps the Court's function of instructing the jury on the applicable legal standards. (See Barth Rep., pp. 6-7, **Ex. B**) (where Dr. Barth states that he will opine on deliberate indifference and actually quotes jury instructions from another case). Third, Federal Rule of Civil Procedure 26(a)(2)(B) requires that an expert *prepare* his own report. Here, Dr. Barth and Dr. Drouillard submitted virtually identical expert reports. Defendants' counsel states that no assistance was provided to Dr. Barth in the preparation of his expert report. Assuming this to be true, the only logical conclusion is that Defendants' counsel used the expert report of Dr. Barth to substantially prepare and draft Dr. Drouillard's expert report. That is improper and consequently Fed.R.Civ.P. 37(c)

requires the exclusion of Dr. Drouillard's expert testimony in all forms.[1]  Finally, Dr. Drouillard's proffered testimony is barred as unreliable under FRE 702 because Defendants' counsel substantially prepared the opinions used by Dr. Drouillard in this case.

There is no presumption of admissibility for the testimony of Drs. Barth and Drouillard; to the contrary, the burden of demonstrating the admissibility of expert testimony rests squarely on the party offering it.  *Muzzey v. Kerr-McGee Chemical Corp*., 921 F.Supp. 511, 518 (N.D. Ill. 1996).  As discussed below, Defendants cannot carry this burden with regard to either Dr. Barth or Dr. Drouillard.

## II.     LEGAL STANDARD

The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 592; 113 S.Ct. 2786, 2796 (1993) imposed an affirmative duty upon district courts to act as gatekeepers by screening "proffered scientific evidence" pursuant to Federal Rule of Procedure 702 to ensure its reliability.  It is the "proponent of the proffered expert testimony [that] bears the burden of establishing its admissibility by a preponderance of proof."  *Muzzey* at 518.

The Supreme Court explained in *Daubert* that "the adjective 'scientific' implies a grounding in the methods and procedures of science" and that "the word 'knowledge' connotes more than subjective belief of unsupported speculation."  *Daubert*, 509 U.S. at 590; 113 S.Ct. at 2795 (citation omitted).  Federal Courts have interpreted *Daubert* to require a district court to undertake a two-step inquiry, "where both steps must be met before testimony is admissible." *Dukes v. Central R. Co*., 934 F.Supp. 939, 947 (N.D. Ill. 1996).  As stated by the Seventh Circuit

---

[1] Plaintiff expects Defendants to argue that Plaintiff's counsel also prepared his expert's report.  That is an entirely different situation, in that Plaintiff's counsel merely compiled sworn statements from Plaintiff's expert's deposition into a cohesive report in an effort to limit the costs to the Court's *pro bono* fund relating to that expert's testimony.

in *O'Connor v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106 (7th Cir. 1994), cert. den., 512 U.S. 1222, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994):

> *Daubert* first directs the district court to determine whether the expert's testimony pertains to scientific knowledge. This task requires that the district court consider whether the testimony has been subjected to the scientific method; it must rule out subjective belief or unsupported speculation. Second, the district court must determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact at issue. That is, the suggested testimony must 'fit' the issue to which the expert is testifying. [Internal quotation marks omitted.]

As proponents of the expert testimony, Defendants bear the burden of showing that both prongs of the *Daubert* analysis are satisfied. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir. 1995) ("Daubert II") at 1315, 1316, 1318 n. 10; *Muzzey*, *supra* at 518. Although an expert in one area of expertise, a witness may be precluded from offering opinions beyond his area of expertise. *Wellman v. Norfolk and Western Ry. Co.*, 98 F.Supp.2d 919, 924 (S.D. Ohio 2000). Even if qualified in general, "whether an 'expert' qualifies to answer questions in a particular case is a different issue." *DeJager Const. Inc., v. Schleininger*, 938 F.Supp. 446, 449 (W.D. Mich. 1996). The Sixth Circuit explained in *Berry v. Detroit,* 25 F.3d 1342, 1350 (6th Cir. 1994) that where an expert proposed to testify on the basis of experience, a foundation must be laid "based upon the witness's firsthand familiarity with" and observations of the subject matter which he intends to testify. *Id.*

In attempting to establish "the reliability of the proffered scientific evidence, an expert's 'bald assurance of validity is not enough. Rather the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology.'" *Sanderson v. Int'l Flavors and Fragrances, Inc.*, 950 F.Supp. 981, 993 (C.D. Cal. 1996) (quoting "Daubert II" at 1317).

6

An expert's conclusions must be supported by good grounds in each step of the analysis: "Any step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible." *United Phosphorous, Ltd. v. Midland Fumigant, Inc.*, 173 F.R.D. 675, 683 (D. Kan. 1997) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)). Ultimately, the Court must ensure that the proffered witness is an expert and "not just a hired gun." *Tyus v. Urban Search Management*, 102 F.3d 256, 263 (7th Cir. 1996).

### III.   LEGAL ARGUMENT

#### A.   Dr. Barth's Proffered Testimony Violates FRE 702 By Failing To Follow Any Reliable Methodology

As mentioned above, the Court must determine whether the proposed expert testimony is sufficiently reliable to be admitted into evidence. Even where the proffered testimony is not scientific and the specific factors identified in *Daubert* are not particularly helpful for determining reliability for "experience based" testimony, "[t]hat does not mean . . . that [the] testimony is freely admissible, because the Court is still required to assess its relevance and to determine that the basis for his conclusions are reliable and will assist the jury in determining the issues in question." *Lake Michigan Contractors*, *Inc. v. Manitowoc Co., Inc.,* 225 F.Supp.2d 791, 795-796 (W.D. Mich. 2002) (J. Quist).

Dr. Barth's testimony is unreliable, insofar as he relies purely on "experience" rather than any form of recognized "methodology." The opinions submitted by Dr. Barth demonstrate that his conclusions are not grounded in a relevant body of knowledge or equivalently disciplined analysis of Michigan Department of Corrections Health Services standards. Rather, they represent unreliable subjective opinion generated solely for the purpose of supporting Defendants' arguments in this litigation.

Dr. Barth's expert testimony, therefore, should be excluded based on the lack of methodology he applied in forming his opinions as to whether CMS and Dr. Abdellatif were deliberately indifferent to Mr. Howard. As a doctor, he analyzed Dr. Abdellatif's medical records and deposition transcript, <u>but he failed to perform any examination of Mr. Howard and disregarded all testimony by Mr. Howard in forming his opinion</u>:

> Q. Do you normally meet with the patients in this matter? I know that you've been an expert for a number of matters before. Do you normally meet with patients?
>
> A. No, I do not. I have occasionally been asked to evaluate people by the judge, you know, Plaintiff, you know for the judge, but, no, I – in general I do not meet Plaintiffs.
>
> Q. So you haven't met him or seen him?
>
> A. No, and I looked through the record because during part of this time, up until 1998, I was the Medical Director at Jackson. And I see he went through RGC in 1990, which is after I left RGC. But before I was going to do anything with regard to this record, I wanted to make sure that even if I couldn't remember it, that there had been no contact with him. [Barth Dep. Tr., pp. 51-52.[2]]

In *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 156 (3d Cir. 1999), the Third Circuit explained that "[d]ifferential diagnosis" is "the basic method of internal medicine." The court went on to state that the reliable manner with which to engage in this basic method involves "ordering standard laboratory tests, ***physically examining the plaintiff, taking medical histories***, and considering alternative causes of the plaintiff's illnesses." *Id.* (emphasis added). Dr. Barth's admission that he did not follow the typical methodology for reaching opinions in his field – including physically examining the patient and taking a medical history – is the key to understanding the unreliability of his testimony. In fact, shockingly, Dr. Barth seems almost proud to be the prototypical hired gun – only agreeing to undertake this engagement after he confirmed that he did not have any prior meetings with the Plaintiff with which to base his

---

[2] Quoted deposition transcript pages are attached under a tab bearing the deponent's name.

opinions. (Barth Dep. Tr., p. 52, quoted *supra* at p. 8). Dr. Barth cements the impression that his testimony has been bought by taking some pleasure in the fact that his deposition testimony has been paid out of the Court's *pro bono* fund:

> Q. Do you agree that if you do any more work for this case you will contact Mr. Richtarcik and let us ask further questions?
>
> A. I don't see why not; okay? I mean, especially since the judge pays for my testimony. [Barth Dep. Tr., p. 56.]

Additionally, Dr. Barth just conjures up facts to support Defendants' case, even if they do not exist in the record. For example, when asked why he concluded that a palpation of Mr. Howard's injury had been performed when it did not appear in the medical records, he responded by saying, "There's no reason for me to think that Dr. Abdellatif didn't do what he normally does in this circumstance." (Barth Dep. Tr., p. 34). However, none of the materials reviewed by Dr. Barth included previous medical records of Dr. Abdellatif in similar situations where he diagnosed an Achilles tendon injury and there is no indication he ever spoke to that Defendant. Dr. Barth goes on to state: "Certainly the note does not reflect specific palpation findings, but it's pretty hard for me to imagine any physician evaluating an ankle injury without touching it and without doing some maneuvers to assess what's going on." (Barth Dep. Tr., p. 36). Dr. Barth continues in this vein, stating:

> A. I don't believe it happened on the 18th of September. In fact, the only objective evidence we have suggests it happened much later.
>
> Q. And what is that evidence?
>
> A. The radiographic report. [Barth Dep. Tr., p. 38.]

Later in the deposition, Dr. Barth admits that he did not actually review the x-ray and that he is not a radiologist. (Barth Dep. Tr., pp. 54-55).

Dr. Barth also engages in the taboo discussion of the plaintiff's credibility and other functions that belong solely to the jury. He actually states that <u>he does not find Mr. Howard to be truthful</u> and <u>did not apply any credibility to the portion of the records which provide Mr. Howard's explanations</u>:

> Q. So earlier when I talked about what you used to form your opinions and the amount of credibility . . . each thing was given, are you stating now that you—are you stating now that you do not apply much credibility to Mr. Howard's statements . . . ?
>
> A. I think the timeline is fallacious, and I think it's clear in my report that I don't understand why Mr. Howard did it, **but he was not truthful** from the time he saw Dr. Urban throughout this whole time period as to when the injury occurred. [Barth Dep. Tr., p. 40; emphasis added.]

The testimony quoted above demonstrates all of the following indicia of unreliability:

1. Expert testimony that seeks to weave a story by relying only upon portions of the record that support his client's position and ignoring others. (*DeJager Construction, supra* at 449, 452, 455); *Lake Michigan Contractors* at 800-802 (failure to account for and consider factors makes opinions unreliable);

2. "[W]hen the facts upon which the expert bases his testimony contradict the evidence." *Greenwell v. Boatright*, 184 F.3d 492, 497 (6th Cir. 1999);

3. Expert testimony which is based on assumptions that are not based on fact or find no support in the record. *Three Crown Ltd. Partnership v. Salomon Brothers, Inc.*, 906 F.Supp. 876 (S.D.N.Y. 1995); *Real Estate Value Co. v. U.S.Air, Inc.*, 979 F.Supp. 731, 744 (N.D.Ill. 1997);

4. Expert testimony founded upon nothing more than the biased and uncorroborated representations of the party proponent of the testimony. *Real Estate Value Co.* at 744; *Target Market Publishing, Inc. v. Advo., Inc.*, 136 F.3d 1139, 1144 (7th Cir. 1998) ("a plaintiff's own uncorroborated testimony is insufficient" "to render [a] damage report's optimistic assumptions plausible"); *United Phosphorous, Ltd.* 173 F.R.D. at 685 (noting that "it is not acceptable methodology for an economist to rely on deposition testimony of an interested party where objective evidence and analysis exists");

5. Expert testimony which fails to set forth the factual basis and methodology employed and thereby effectively precludes cross-examination. *Lake Michigan Contractors* at 799-800 ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the

expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered") (citation omitted); and

6. "Expert testimony is not needed to determine whether a declarant or witness is telling the truth." *DeJager Const.*, 938 F.Supp. at 449.

In summary, Dr. Barth's proffered testimony is inherently unreliable and is not founded upon any recognizable methodology typically relied upon by experts in his field. This is most evident from the fact that Dr. Barth did not attempt to physically examine the Plaintiff despite having every opportunity to do so. To the contrary, he was content to be provided with the facts and conclusions he was supposed to reach by Defendants' counsel.

The opinion offered by Dr. Barth relies on nothing more than the conjectured factual data that will enable Defendants to further their legal theory of the case. Dr. Barth is not allowed to rely solely on the evidence and information provided to him by Defendants' counsel. This does not amount to a recognized methodology for reaching expert opinions, and such testimony should be precluded from introduction at trial.

### B. Pursuant to FRE 704, Dr. Barth's Expert Testimony Is Inadmissible Because It Constitutes A Collection Of Legal Conclusions

Equally troublesome, Dr. Barth makes it clear that he intends to go beyond permissible specialized testimony on facts <u>related</u> to the ultimate issue. He intends to engage in an inappropriate <u>fact finding exercise</u>, and has done so already. Beyond specifically stating in his report that the purpose of his expert report is to form conclusions based on the jury instructions from a prior case (Barth Rep., pp. 6-7, Ex. B), Dr. Barth proffers opinions on whether Dr. Abdellatif and CMS were "deliberately indifferent." (See discussion, *supra*, at p. 4). He does this not once or twice, but in four different areas of his expert report. (See discussion, *infra* at p. 13-14). That is a fair indication that his testimony will be centered upon communicating to the jury that the Plaintiff has not met his legal burden. If admitted, his testimony would supplant the

role of the jury by telling it what to think through conclusory legal opinions about the ultimate issue.

Federal courts have discretion to restrict testimony on ultimate issues for the trier of fact. *United States v. Sheffey*, 57 F.3d 1419, 1425 (6th Cir. 1989) (exclusion of expert testimony proper if expert's opinion on the ultimate issue amounts to a legal conclusion). Expert opinions should not be admitted if they merely tell the jury what result to reach. *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997) ("It is, therefore, apparent that testimony offering nothing more than a legal conclusion, i.e., testimony that does little more than tell the jury what result to reach – is properly excludable under the Rules"). In *Shahid v. City of Detroit*, 889 F.2d 1543, 1548 (6th Cir. 1989), the Court held:

> Federal Rule of Evidence 704 permits a witness to testify in the form of an opinion or inference to an "ultimate issue to be decided by the trier of fact." However, "[i]t is not for the witness to instruct the jury as to applicable principles of law, but for the judge."

Similarly, in *Berry v. City of Detroit*, the Sixth Circuit held that the district court erred in admitting expert's testimony at trial that the police department's training of its officers constituted deliberate indifference because deliberate indifference is a legal term and it is the responsibility of the court, not testifying witnesses to define legal terms. 25 F.3d at 1353.

Defendants' counsel is certainly aware of this Sixth Circuit authority because they relied on the *Berry* holding in *McLain v. Secure Care, Inc.*, 2007 WL 1219048 (E.D. Mich. 2007) (attached as **Exhibit D**) where the Court granted their motion *in limine* to preclude plaintiffs from using an expert that testified as to deliberate indifference. Mr. Richtarcik's arguments in *McLain* are applicable to his own expert's testimony in this case. As Judge Edmunds observed in *McLain* when the shoe was on the other foot, "'deliberate indifference' is a legal term . . . . It is

the responsibility of the court, not testifying witnesses, to define legal terms. An expert's testimony in this regard invades the province of the Court." *Id*. at *4, fn. 2.

The same conclusion was reached by Judge Miles of this Court in *Woodhull v. County of Kent,* 2006 WL 2228986 (W.D. Mich. 20006) (attached as **Exhibit E**) (which also involved Defendant CMS and Defendants' counsel Ronald Chapman). There, in concluding that "[d]eliberate indifference is a legal term," and that "[a]n expert may not opine on the question of deliberate indifference because this expresses a legal conclusion," Judge Miles explained as follows:

> [W]hether or not a defendant acted with deliberate indifference is dependant on their subjective state of mind. No one, including an expert, can delve into a defendant's subjective state of mind. Objective facts and circumstances may provide evidence of a defendant's state of mind, but ***conclusory statements that a defendant acted with deliberate indifference do not assist the trier of fact.*** Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in the closing arguments. [*Id*. at *6; emphasis added; citations and internal punctuations omitted].

All Dr. Barth attempts to do is impermissibly and repeatedly opine about this legal conclusion:

> "My review of Plaintiff's medical records – corroborated by the depositions – does not demonstrate any delay or denial of care based on a policy or practice of **deliberate indifference**." (Barth Rep., p. 7, Ex. B**;** emphasis added).

> "In my medical opinion and judgment, the alleged delays by Defendant CMS in providing follow-up care and surgical repair or Plaintiff's Achilles tendon injury were not the result of a policy or practice that was **deliberately indifferent** to Plaintiff's serious medical needs." (*Id*., p. 10-11; emphasis added).

> "Plaintiff suggests without convincing supportive evidence that his access to this care was denied and delayed based on a **policy or practice of indifference** to his needs. The record suggests that the decision making and implementation of his care plan was based on an erroneous assumption fostered by the Plaintiff that his injury

13

> occurred at least two weeks before it could have possibly occurred." (*Id*., p. 12-13; emphasis added).

> "The resultant delays that occurred do not appear to reflect a **policy, process or practice of deliberate indifference** to Plaintiff's serious medical needs." (*Id*., p. 13; emphasis added).

In *Murphy v. Gilman*, 2006 WL 3613754, *2 (W.D. Mich. 2006) (J. Enslen) (attached as **Exhibit F**), the Court granted a motion *in limine* to preclude an expert witness from testifying to the ultimate issue in the case on "whether Defendants were deliberately indifferent" because "allowing plaintiff's experts to testify to such matters will give the impression that those experts know the answer to the inquiry which will result in juror confusion." For that same reason Dr. Barth's conclusory testimony on the ultimate issue should be found inadmissible. This opinion is so ingrained in his overall report and is stated in so many different ways that there is no other solution than to exclude his testimony as a whole.

C. **Pursuant to FRE 403, Dr. Barth's Testimony Is Inadmissible Because Its Speculative And Conclusory Nature Is Overly Prejudicial To The Plaintiff**

Assuming arguendo that Dr. Barth did not receive substantial aid from Defendants' counsel in preparing his expert report, and assuming it contains reliable, relevant opinion testimony (which it does not), his testimony should still be excluded under FRE 403.

Even if an expert is properly qualified, and the opinions are both relevant and reliable, their testimony may still be excluded through application of FRE 403:

> Because of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise met the admissibility requirements may still be excluded by applying Rule 403. Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, or if the expert testimony is cumulative or needlessly time consuming. [The] ***admission of speculative and potentially confusing testimony*** is at

14

> odds with the purposes of expert testimony as envisioned in Fed.R.Evid. 702. The judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses. Simply put, ***expert testimony may be assigned talismanic significance in the eyes of lay jurors***, and therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse.

*United States v. Masferrer*, 367 F.Supp.2d 1365, 1373-1374 (S.D. Fla. 2005) (internal citations omitted) (emphasis added).

None of Defendants' fact witnesses have testified that they have any substantive knowledge to contradict Plaintiff's assertion that the injury occurred on September 18, 2002. Despite that, Dr. Barth has the gall to testify that the Plaintiff was actually injured much later. That bold and fanciful statement not only speculates about facts not in evidence, but clearly disregards all record evidence to the contrary:

> The reasons as to why the Plaintiff did not report this [rupture after date given by Plaintiff] to Dr. Abdellatif or his subsequent physicians is not apparent in any of the documents I reviewed. Perhaps Plaintiff did not appreciate the magnitude of his injury . . . . If it had been known that Plaintiff's tendon rupture occurred between October 4 and October 18, 2002, an entirely different, <u>urgent</u> process of health care provision would have come into play . . . " (Barth Rep., p. 8-9, Ex. B) (emphasis in original).

It is obvious that Dr. Barth is doing nothing more than parroting Defendants' legal theories and clothing them with an air of authority. He is nothing but a hired gun paid to fill in the factual gaps of Defendants' case and such testimony is likely to be assigned an entirely disproportionate weight by the jury. Indeed, most of the opinions contained within Dr. Barth's report must be excluded as they are irrelevant, lack foundation, are speculative, and/or inadmissible pursuant to FRE 403. The probative value of Dr. Barth's opinions are substantially outweighed by the danger of unfair prejudice, confusion of the jury, and undue delay or waste of time.

### D. Dr. Drouillard's Proffered Expert Testimony Violates The Federal Rules of Civil Procedure And The Federal Rules of Evidence

#### 1. Pursuant To Fed.R.Civ.P. 26(a)(2)(b) And 37(c)(1), Dr. Drouillard's Testimony Is Inadmissible Because He Did Not Substantially Prepare His Own Opinion

Federal Rule of Civil Procedure 26(a)(2)(B) states that the disclosure of an expert must "be accompanied by a written report—*prepared* and signed by the witness." (Emphasis added). Dr. Drouillard, however, appears not to have prepared his own report. Instead, his report appears to have been prepared by Defendants' counsel from a draft of Dr. Barth's own expert report and later signed by Dr. Drouillard.[3] Fed.R.Civ.P. 37(c)(1) states that a "party that with substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at trial . . . any witness or information not so disclosed." The sanction for this conduct is clear – Dr. Drouillard should not be allowed to testify at trial.

Almost every page of Drs. Barth and Drouillard's expert reports have identical text, with the inclusion of minor word/phrase differences. For example, both experts opine:

> In my medical opinion and judgment, the examination, treatment, and care plan initiated by Dr. Abdellatif, as confirmed by the medical record and his Deposition testimony, is with the medical standard of care and training of a licensed physician practicing the medical specialty of internal medicine. (Barth Rep., p. 9, Ex. B).

> In my medical opinion and judgment, the medical examination, treatment, and care provided by Dr. Abdellatif, as observed in Plaintiff's medical chart and the deposition testimony of Dr. Abdellatif, is within the medical standard of care and training of a licensed physician practicing the medical specialties of Internal Medicine and/or Rheumatology under the circumstances. (Drouillard Rep., p. 3, Ex. C).

---

[3] Dr. Drouillard testified in his deposition that he "probably spent two to three hours" reviewing the material provided by Defendants' counsel. (Drouillard Dep. Tr., p. 9).

See also chart, *supra* at pp. 2-4 (showing striking similarities in reports). These reports also note facts, which they claim stem from the medical record observations of Dr. Abdellatif, but can actually only be reached through <u>inference</u> when piecing together medical entries and through purported reliance on the deposition testimony of Dr. Abdellatif (despite the fact that Defendant stated that he had no independent recollection of the treatment provided to Mr. Howard). In particular they opine:

> Dr. Abdellatif's examination was within the standard of care. His ***documented observations*** included the following: Plaintiff was able to walk with a ***slight*** limp but could flex and extend his left ankle without difficulty, Plaintiff did not complain of ***significant*** pain. (Barth Rep., p. 9, Ex. B) (emphasis added).

> Dr. Abdellatif's examination was within the standard of care. His ***observations***, included the following: Plaintiff was able to walk with a ***slight*** limp but could flex and extend his left ankle without difficulty, Plaintiff did not complain of ***significant*** pain. (Drouillard Rep., p. 3, Ex. C) (emphasis added).

This is significant because unless the experts miraculously reached the exact same substantive opinions and used the same exact language to express them, the reports of both were generated by a single source. This is buttressed by the fact that the changes made by Dr. Drouillard to the substantive portion of the draft he was given by Defendants' counsel were minimal and cosmetic at best. See Draft Drouillard Report, Ex. A.

The Federal Rules of Evidence and Civil Procedure envision that expert witnesses should come to their own opinions and conclusions and prepare their own reports:

> A party receiving an adversary's expert's signed report has the right to rely upon the document for what it purports to be - the expert's considered analysis of facts and statement of opinions applying the expert's special education, training and experience. Experts participate in a case because, ultimately, the trier of fact will be assisted by their opinions, pursuant to Rule 702, Fed.R.Evid. They do not participate as the alter-ego of the attorney who will be trying the case. [*Occulto v. Adamar of New Jersey, Inc.*, 125 F.R.D. 611, 615-16 (D. N.J. 1989)].

Counsel provided a draft (presumably based on Dr. Barth's report) to Dr. Drouillard. Counsel's draft opinion undoubtedly shaped the views of Dr. Drouillard on the issues of the case and was in fact wholly adopted by the expert. Plaintiff is entitled to face experts who draw their own conclusions – not experts who regurgitate opinions spoon fed to them by Defendants' counsel.

The court in *In re Jackson* faced a nearly identical situation. 2000 WL 33654070 (W.D. Mich. February 8, 2000) (Judge McKeague affirming decision of Magistrate Judge Scoville) (attached as **Exhibit G**). There, plaintiffs' attorneys provided the expert with a report that had "undeniable substantial similarities" to a report filed by another expert who had the assistance of the same attorneys in a different case. *Id*. at *1. The court stated:

> The record clearly supports the finding that the language of Mr. Bieluch's report, including the formulation of his opinions, was not prepared by him, but was provided to him by plaintiffs' counsel. Granted, Rule 26(a)(2) contemplates some assistance of counsel in the preparation of an expert's report. . . . . **However, undeniable substantial similarities between Mr. Bieluch's report and the report of another expert prepared with assistance from the same counsel in an unrelated case, demonstrate that counsel's participation so exceeded the bounds of legitimate "assistance" as to negate the possibility that Mr. Bieluch actually prepared his own report within the meaning of Rule 26(a)(2).** Plaintiffs' failure to furnish defendant with a report prepared by Mr. Bieluch constitutes a violation of Rule 26(a)(2). [*Id*. (emphasis added)].

The court in *In re Jackson* excluded the expert's testimony as a remedy for the violation of Rule 26(a)(2). *Id*. The situation in this case is almost identical to *In re Jackson*. By drafting Dr. Drouillard's expert report, based on the expert report of Dr. Barth, Defendants' counsel improperly shaped the views of the expert. Just as in *In re Jackson*, this Court should exclude Dr. Drouillard's expert report and testimony from trial under Rule 37(c)(1) for violating Rule 26(a)(2).

### 2. Pursuant to FRE 702, Dr. Drouillard's Opinions are Inadmissible

Defendants' attorney-drafted opinions for Dr. Drouillard not only run afoul of the Federal Rules of Civil Procedure, they also violate FRE 702 and *Daubert*. In *Trigon Ins. Co. v. United States*, 204 F.R.D. 277 (E.D. Va. 2001), a party's expert reports were allegedly ghost-written by litigation consultants. The court noted that "if opinions expressed in an expert report are not the opinions of the expert, the expert will not be able to satisfy the requirements of FRE 702 and *Daubert* that the report be based on the expert's own valid reasoning and methodology." *Id*. at 294 (emphasis added). The court added that "under the analysis required by Rule 702, absent independence from the party or its advocates, a testifying expert lacks credibility necessary to be of assistance to the trier of fact." *Id*. at 295.

Additionally, *Daubert* directs courts to "determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." 509 U.S. 579, 592-93. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether the reasoning or methodology properly can be applied to the facts in issue." *Id*. Here, Dr. Drouillard's expert report was prepared by Defendants' attorneys. There was no scientific reasoning or methodology applied by Dr. Drouillard. Drouillard essentially copied Dr. Barth's report. Even if the report and testimony were based on his own opinions, they would still be unreliable, irrelevant and conclusory, and therefore inadmissible under FRE 702, for the same reasons that Dr. Barth's opinions are inadmissible.

## IV.     CONCLUSION

For the foregoing reasons, namely that: (1) Dr. Barth's proffered testimony is unreliable; (2) Dr. Barth's proffered testimony is not relevant; (3) Dr. Barth is precluded form opining on an ultimate issue of fact; (4) Dr. Drouillard's proffered testimony is not reliable; and (5) Dr. Drouillard was required to prepare his own report but did not – Plaintiff respectfully requests that this Honorable Court grant his motion and preclude both of Defendants' proffered experts from testifying at trial.

    Respectfully Submitted,

    DICKINSON WRIGHT PLLC
    Attorneys for Frank L. Howard.

    By:   */s/ Edward P. Perdue*
        Edward P. Perdue (P55888)
        Julie Westra (P71388)
    200 Ottawa NW, Suite 900
    Grand Rapids, MI  49503
    (616) 458-1300
    eperdue@dickinsonwright.com

Dated:  June 11, 2008

GRAPIDS  221779v1